STATE

*vs.*

IRVING MOREY, WALTER A. LORD AND FRANK PIKE

· Oxford.   Opinion August 22, 1927.

*A conviction may be had on the uncorroborated evidence of an accomplice, but such testimony shall be received with great caution and discrimination.  But the credibility of the witness is for the jury and they may convict on his testimony alone if it convinces beyond ā reasonable doubt.*

*If a person causes a crime to be committed through the instrumentality of an innocent agent, he is the principal of the crime although not present at the time and place of the offense.*

*Falsehood on the part of respondents and their supporting witness may properly be regarded as strong evidence of guilt.*

Newly discovered evidence, clearly within the rule may not, and in this case, does not, carry sufficient weight to warrant submission of the case to another jury.

The real question raised by these appeals is, whether or not justice demands a different result and therefore, requires a new trial.

The instant case does not present that situation. No innocent man has been wronged by the findings of the jury nor by the refusal of the presiding justice to grant the motions appealed from.

On general motion and motion for new trial on newly discovered evidence. The respondents were indicted for larceny and were tried by a jury resulting in an acquittal for Morey, and a conviction of Lord and Pike. The convicted respondents filed a general motion for a new trial addressed to the presiding justice which was denied and an appeal taken. They then filed a motion for a new trial on newly discovered evidence addressed to the presiding justice which also was denied and an appeal taken. Appeals dismissed.

The case fully appears in the opinion.

*William J. Flanagan, County Attorney,* for the State.
*Alton C. Wheeler and E. Walker Abbott,* for Walter Lord.
*Harry Manser and Wilfred G. Conary,* for Frank Pike.
*Matthew McCarthy,* for Irving Morey.

SITTING: PHILBROOK, DUNN, DEASY, STURGIS, PATTANGALL, JJ.

PATTANGALL, J. The above named respondents were indicted and tried, jointly, on a charge of grand larceny. Morey, who testified for the state, was acquitted. Lord and Pike were convicted. Motions, in the usual form, to set aside the verdict, were filed on behalf of both convicted men and on denial of the same, appeals to this court were taken. Later, additional motions were filed, asking for a new trial on grounds of newly discovered evidence. These motions were also denied and appealed from. All of these appeals are considered together.

*Statement of Case.*

The subject of the alleged larceny was a thoroughbred Hereford steer, three years old, valued, in the indictment, at $120, the property of one Watson and said to have been stolen by these respondents from the Warren pasture, so-called, in the town of Waterford. The larceny was alleged to have occurred on Sept. 1, 1925.

Lord and his son-in-law Pike were residents of Waterford, occupying a farm distant about a mile and a half from the Warren pasture. They had carried on, jointly, since 1924, a somewhat extensive cattle buying, slaughtering and meat selling business. Morey was a laboring man and small farmer. From April 1924 to April 1925 he lived at Lord's and was employed by Lord and Pike regularly in their business and as an assistant in the farm work. After leaving their regular employ he moved to a small farm of his own, distant about a mile, but continued to butcher for them, at irregular times as his services were required.

Sometime in August 1925, the steer in question was stolen from the Warren pasture, brought to the Lord place and slaughtered there, Morey and Pike doing the actual killing, Lord being present and rendering some assistance in connection with the work. The carcass was divided between Lord and Pike and the meat sold by them. Morey testified that he was paid $10 for his part of the work, each of the others paying him $5. The other respondents testified that they paid him $30 each and that the $60 constituted the purchase price of the steer. Morey testified that, after a conference with Lord, he and Pike went from the Lord place direct to the Warren pasture, roped the steer and brought it to the slaughter house. The other respondents testified that Morey, alone, brought the steer to them, represented it as his own; and that they did not know where he procured it. They all agreed that it reached Lord's late in the afternoon, not earlier than four o'clock.

On August 16th, Irving Green, who was in charge of the cattle in the Warren pasture, missed the steer from the herd and thinking that the animal had strayed into the neighboring woods, searched for him, without success. He searched again, with the same result, about September 1; notified Mr. Watson of the situation and again searched in November. Mr. Watson then advertised the loss of the steer for three weeks, in the Norway Advertiser.

At some time prior to August 1926, Morey became jealous of attentions shown by Lord to Mrs. Morey and during that month reported to Watson that he and Pike had taken the steer from the pasture and that Lord and Pike had slaughtered and sold the animal. Whereupon Watson placed a claim with an attorney against Lord and Pike, for the value of the steer. The claim was paid, Lord, Pike and Morey, contributing $40 each. The indictment was brought some two months later.

### General Motion.

At the trial which followed Morey testified that at some time during the early part of August 1925 he was called to the Lord place to do some butchering, that after a conference in which Lord, Pike and himself joined, he, with Pike and under Pike's direction, proceeded to the Warren pasture and returned with the steer; that he and Pike killed the animal in Lord's presence; that Lord brought the water to wash up after the butchering was over and that after the job was completed Lord and Pike each gave him $5. He said that his usual price for dressing a steer was one dollar, that he asked what the additional money was for and the reply was, "for helping get this steer and keeping still about it." He also testified that, at Lord's direction, he put the head and feet in a bag and that on a later date Lord informed him as to how and where he had secreted them.

Morey denied having had any guilty knowledge at the time of the larceny of the steer from the pasture. He said that his suspicions were not aroused that there was anything wrong about the transaction until he was paid the money as stated. Presumably the jury accepted this testimony at its full face value otherwise their verdict of acquittal in his case would be inexplicable.

He testified to Pike's direct participation in the theft. And the jury were justified, if they accepted his version of the matter as the truth, in finding not only that Pike was guilty but that Lord, while not an actual participant in the crime, planned it, directed it, arranged with Pike and Morey as to what was to be done and adopted the acts of Pike and Morey as his own, profiting by them equally with Pike. The jury found that Morey was not guilty. If so he was the innocent agent of Lord and Pike, who were engaged in a joint criminal enterprise.

If a person causes a crime to be committed through the instrumentality of an innocent agent, he is the principal in the crime although he was not present at the time and place of the offense. *State* v. *Shurtleff*, 18 Me. 371. *U. S.* v. *Gooding*, 12 Wheat. 469. *State* v. *Soper*, 16 Me. 298.

There was sufficient in Morey's evidence to warrant the verdict. He was, to be sure, an accomplice and his evidence was without direct corroboration. He also admitted that his purpose in finally making known the facts was to revenge himself upon Lord for interference in his domestic affairs. But the jurors were the judges of his credibility.

The testimony of an accomplice is received, though with great caution and discrimination. His credibility is a question for the jury and they may convict on his testimony without corroboration, if sufficient to satisfy them beyond a reasonable doubt. *Sinclair* v. *Jackson*, 47 Me. 105.

The testimony of Morey was attacked from every angle. It was admitted that the steer was slaughtered at Lord's and the meat divided between Lord and Pike and sold by them. But it was claimed that the transaction was an entirely legitimate proceeding; that Morey brought the steer to Lord's and sold it to them; that they bought it in good faith, believing it to be his and paid him a fair price for it; that later, they contributed $80 toward paying Watson's claim, because they recognized a civil liability on their part and were only able to get $40 from Morey on account of his poverty.

The jury may, very properly, have been influenced, in its verdict, by certain features of the defense set up by Lord and Pike. Its very nature and character may have added to rather than substracted from the weight of Morey's testimony. The indictment charged the larceny as having occurred on September 1. The evidence adduced by the state in rebuttal, entirely aside from any statement of Morey's, was sufficient to justify a finding beyond a reasonable doubt that it actually occurred two weeks prior to that time. But the defense was built around the date in the indictment.

Frank Pike testified that he never bought anything of Morey excepting on Sept. 1. Roy Lord testified to the steer being brought to the slaughter house on Sept. 1. Walter A. Lord swore to the same date. Then followed a mass of testimony as to just what occurred

on that particular day, all carefully and painstakingly related and the date positively fixed by reference to other events of more or less importance. An alibi was prepared for Pike and it was shown by credible and obviously truthful testimony that on Sept. 1, he was not where he could have accompanied Morey to the Watson pasture. When it transpired that the steer was stolen prior to August 16th this elaborate defense was entirely destroyed. The alibi evidence became immaterial and the transparent falsehood of the detailed stories as to what happened between Lord, Pike and Morey at the Lord farm in the late afternoon of Sept. 1st, became apparent. A less carefully manufactured defense might have impressed the jury. The cornerstone of the structure reared by the respondents rested on the date alleged in the indictment. When that prop was removed the whole structure, ingeniously erected, fell.

A careful examination of the evidence adduced at the trial reveals no error on the part of the jury in searching out the truth from the mass of contradictory evidence submitted, much of which was immaterial and a large part of which was obviously false.

*Newly Discovered Evidence.*

This evidence consists first, of testimony tending to show the unlikelihood, if not the impossibility of Morey having followed the route described by him in leading the steer from the Warren pasture to Lord's, and second, of the testimony of Mr. & Mrs. Kittredge that in the late summer or early fall of 1925, Morey, travelling alone, led a steer, similar in appearance to the stolen animal, by Kittredge's farm on a road leading toward Lord's. If this were true and if the steer so led were the one in question, Morey's testimony was false and the state's case fails.

As to the first proposition the evidence is not convincing. It is not demonstrated that it was impossible or even improbable that Pike and Morey followed the route testified to by the latter. In fact it was the sort of route that, inconvenient as it apparently was, would appeal to men engaged in an unlawful enterprise and was doubtless selected by Pike who was in charge of the expedition.

The second proposition is more difficult. The testimony of Mr. and Mrs. Kittredge, fairly coming within the rule as to what constitutes newly discovered evidence, at first glance seems of great

importance. But reasonably careful analysis reveals its weakness. There is no doubt but that, at some time, in the summer of 1925, Morey led a steer by Kittredge's farm to the Lord place, stopping to rest at Kittredge's at noon. The important questions at issue are the date of the event and the identity of the animal.

On May 16, 1925, Frank Pike bought a steer of Frank Stone of Sweden which was delivered to Morey who led it to Lord's. On the journey he necessarily passed the Kittredge farm. He stopped there at noon. By a coincidence merely, the price of this steer was $60.

Kittredge testified that Morey never stopped at his home with a steer but once. In October 1926, he fixed the date as early in the summer. From the Kittredge farm to the Lord farm is a walk of from ten to thirty minutes, dependent upon which road is followed. By all of the testimony in the case, Morey arrived at Lord's with the stolen steer not earlier than four in the afternoon. The day that he rested at the Kittredge place he left for Lord's at about noon. Kittredge testified that Morey told him that he had brought the steer from Sweden. Assuming the good faith of Mr. and Mrs. Kittredge (and there is no reason to doubt it) they are now mistaken as to the date and are confusing one occurrence with the other. Mr. Kittredge's first statement concerning the date was apparently correct.

We do not regard it as probable that the additional evidence would change the result of the case were it again submitted to a jury. Nor do we think that justice requires a different result. A study of the whole case, the old evidence and the new, forces the conclusion that no innocent man was wronged either by the findings of the jury or by the refusal of the presiding justice to grant either of the motions filed by the respondents.

*Appeals dismissed.*